# EXHIBIT 2

# LICENSE AGREEMENT

This LICENSEE AGREEMENT ("Agreement") is entered into on this 30th day of January in the year 2019 by and between Adyar Ananda Bhavan Sweets and Snacks, Inc. (the "Master Licensee"), a Pennsylvania Corporation, with a principal location at 3313 Alydar Road, Downingtown, Pennsylvania 19335, USA;

AND

Blue Bell USA, LLC (the "Sub-Licensee"), a New Jersey Limited Liability Company with its principal location at 3159 US-46, Parsippany, NJ 07054. The purpose of the company is a food business of any kind and nature, and all lawful business for which limited liability companies may be organized under the laws of the State of New Jersey. Mr. Senthilkumar Rajasekaran is the authorized signatory of the company, with EIN of 47-4923640.

The Terms MASTER LICENSEE and SUB-LICENSEE will unless repugnant to the context mean and include their legal representatives or otherwise, successors, successors in interest, nominees, assignees, Directors and constituted attorneys.

## OVERVIEW

The MASTER LICENSEE by virtue of the Master License Agreement, dated January 2017 between Adyar Ananda Bhavan Sweets India Private Limited and Adyar Ananda Bhavan Sweets & Snacks, Inc., has acquired the rights to appoint Sub-Licensees in the United States, and has decided to grant rights to start an outlet at 3159 US-46, Parsippany, NJ 07054 to run a restaurant with facilities to manufacture and sell sweets, savories, ice creams, bakery products, healthy foods, packaged foods, spices, etc. under the trade name A2B.

The MASTER LICENSEE has acquired knowledge from the Licensor with reference to original layout of stores, usage of quality raw material and recipe for finished goods and use of logos and signage boards.

The MASTER LICENSEE is empowered to appoint the Sub-Licensee and take suitable steps in proper running of restaurants without damaging in any way the goodwill and reputation built over decades by the Licensor.

## 1. DEFINITIONS

The following terms when used in this agreement will have the following meanings.

AFFILIATE means any person or persons related directly or indirectly through intermediaries. It also includes any persons having controlling interest whether direct or indirect.

APPLICABLE LAW means all laws, rules, regulations, ordinances or all requirements of government authority which will have jurisdiction over the Approved Location.

APPROVED LOCATION means location selected by the Master Licensee and Sub-Licensee and approved by the Licensor, specifically 3159 US-46, Parsippany, NJ 07054.

ASSIGNMENT is each of the following acts under this agreement will be deemed to be assignment: any sale, transfer, sub-license or relinquishment of any rights or any part thereof which are conferred by the Sub-Licensee by virtue of this agreement, legal or beneficial.

B.R

**COMMENCEMENT DATE** means the first day of offering goods and services to the public as a restaurant operation.

**CONFIDENTIAL INFORMATION** means all information shared by a party to this Agreement in relation to business activity, production, sales, marketing, techniques, etc.; and such information may be in the form of oral, written or any other process including machine readable form.

**DATA PROTECTION LAW** means applicable data protection and privacy laws and regulation.

**FISCAL YEAR** means the period of January 1 to December 31 of any year.

**GROSS REVENUES** mean sales and receipt of every kind arising out of the restaurant operation including credit card commission charges, gratuity, service charges, sales tax, or any other tax called under any other name.

**INTELLECTUAL PROPERTY/PROPRIETORY MARKS** means the licensed marks, water marks, trademarks, logos, emblems [by way of example: ADYAR ANANDA BHAVAN, ADYAR ANANDA BHAVAN SWEETS & SNACKS, A2B, A2B VEG RESTAURANT, AAB BAKERY, ADYAR ICECREAMS, H2H]. The term applies whether these marks are owned by Licensor or any of its affiliates. It will also cover such other trademark, water mark, logos, emblems, licensed marks which will be created, developed, acquired by the Licensor or by any of its affiliates at any time.

**NET REVENUE** is defined as sales less expenses, including revenue from sales of Sweets and Savories made in-house, but excluding revenue from sales of Sweets and Savories purchased by Sub Licensee from Licensor, gratuity, service charges, operating costs, refunds, discounts, and taxes.

**PROFIT** is defined as total revenue less total expenses, gratuity, and service charges, prior to bonuses, draws, or distributions to owners, members, or shareholders.

**QUALITY & STANDARDS** means the quality standards set by the Licensor, which will be enforced against the Sub-Licensee by the Master Licensee. The Sub-Licensee will be provided with and must follow the operating manuals, standard operating procedures, and controls provided.

**ROYALTY** means the fees collected as a percentage by the Master Licensee from the Sub-Licensee as more clearly specified elsewhere in this agreement.

**TAXES** includes taxes of all kind which are applicable to the line of business contemplated under this agreement and which are leviable by any government authority including any federal, state, local authorities.

**TRANSFER OF RIGHTS** means any sale, assignment, conveyance, mortgage, encumbrance, lease or other transfer or disposition, voluntarily or otherwise, absolutely or conditionally, directly or indirectly by operation of law or otherwise.

## 2. GRANT OF LICENSE

2.1 Mark Grant. By virtue of the Master License Agreement, the Master Licensee hereby grants a non-exclusive revocable license to the Sub-Licensee to affix the Proprietary Marks to the Licensed Products and to use them in connection with the sale of Licensed Products in the Approved Location. This grant includes all licensed marks, trademarks, water marks, logos, emblems which are available and in possession of the Master Licensee (attached in Appendix A). In consideration for brand rights the

B. R

Sub-Licensee shall assign to the Master Licensee a profit share of TWENTY-PERCENT (20%) in the sub-licensee company. An Equity Contribution of 5% will be made by the Master Licensee against investment in the sub -licensee company. Profit-Sharing distribution will be made by Sub-Licensee on an annual basis and will be settled by May 15th of following year.

For example, the profit share of the year 2019 will be settled by the May 15th of 2020.

2.2 Know-How Grant. By virtue of the Master License Agreement, the Master Licensee hereby grants a non-exclusive revocable license to the Sub-Licensee to use the Know-How to make the Licensed Products, and to disclose the Know-How to such suppliers, subcontractors and other third parties to whom disclosure is necessary for the Sub-Licensee to practice the Licensed Rights.

2.3 The Sub-Licensee agrees to conduct the operation in the Approved Location only and not in any other Place, in accordance with the letter and spirit of this Agreement and will take utmost care in maintaining the value of the Proprietary Marks.

2.4 The observance and performance of any act or deeds under this Agreement does not confer to the Sub-Licensee any title to or interest in the Proprietary Marks beyond the scope of the License.

2.5 The Sub-Licensee does not have any rights to transfer, sublicense, or allow any third party or other persons to use the Proprietary Marks or the Licensed Products.

2.6 The Sub-Licensee's rights to use the Proprietary Marks are not exclusive and the Master Licensee has the right to allot the same to any other licensee.

2.7 Master Licensee agrees not to issue Grant of License of any kind or enter into Licensee agreement with any other party to allow them to operate within 60 miles radius of Sub-Licensee state of New Jersey.

## 3. ROYALTY, FEES, and FUNDS

3.1 Royalty. Sub-Licensee hereby agrees to pay to Master Licensee the following Royalty payments:

A Royalty of FIVE PERCENT (5%) until breakeven and SIX PERCENT (6%) after breakeven of Net Revenue, which will be paid on a monthly basis, on the 20th day of every month for the prior months' earnings. Net Revenue is defined as sales less expenses, including revenue from sales of Sweets and Savories made in-house, but excluding revenue from sales of Sweets and Savories purchased by Sub Licensee from Licensor, gratuity, and service charges, operating costs, refunds, discounts, and taxes. Not later than the 15th day of each month, the Sub-Licensee will submit a revenue report to the Master Licensee showing gross revenues, and net revenue for the preceding month.

3.1.1.1. The sales from Sweets and Snacks that are made in-house will be included into the calculation of Net Revenue and included in revenue reports, therefore will be accounted for Royalty.

3.1.2 The annual Profit Sharing of TWENTY-PERCENT (20%) and Equity Payment of FIVE-PERCENT (5%) will be paid on annually basis and settled by May 15th of following year. Profit is defined as gross revenue less total expenses, gratuity, service charges, prior to bonuses, draws, or distributions to owners, members, or shareholders and any other personal expenses. Not later than March 31st of each year, the Sub-Licensee will submit a balance sheet and profit and loss report to the Master Licensee showing total profit for the preceding year.

B.R

3.1.3 All Royalty payments will be made to Master Licensee in U.S. Dollars via a wire transfer (account information will be provided by the Master Licensee).

3.2 Terms, Late Fees and Interest, and Taxes.

3.2.1 Sub-Licensee will pay the Royalty within the due date specified herein. If there is any delay in payment, TWO PERCENT (2%) interest annually will be payable on all amounts due from the due date to the date such payment is actually paid.

3.2.2 Taxes. Sub-Licensee agrees to pay all taxes that are payable by Blue Bell USA, LLC by virtue of its business operation. Sub-Licensee will account for and pay any taxes deducted or withholding taxes promptly and, upon request, will provide to the Master Licensee receipts or other proof of such payment. Sub-Licensee agrees that it will not hold Master Licensee responsible for any tax payment. If Sub-Licensee disputes or contests the validity of a tax or of the amount of a tax, Sub-Licensee hereby promises to not permit the sale or seizure by levy of execution or similar writ or warrant or attachment by creditor, to occur against any part of the Sub-Licensee's business.

## 4. TERM OF AGREEMENT

4.1 This Agreement and the Licenses contained herein will remain in force initially for a period of ten (10) years, unless terminated by the parties by mutual consent, or upon not less than ninety (90) days' prior written notice to the other party.

## 5. ADVERTISMENT AND MARKETING

5.1 The Sub-Licensee will prominently display the Proprietary Marks on all marketing materials and signboards. Master Licensee will be kept up to date on the usage of the Proprietary Marks, but no requests to use the Proprietary Marks need be made.

5.2 The Sub-Licensee understands that it must take suitable steps to advertise in local print media, visual media, electronic media, etc. for successful operation of the Approved Location.

## 6. MASTER LICENSEE COVENANTS.

6.1 The Licensor is the sole and exclusive owner of the Proprietary Marks, Licensed Products and other intangible property related thereto. The Master Licensee, by virtue of the rights granted by Licensor, has granted rights to use the Proprietary Marks and Licensed Products to the Sub-Licensee in its operations to run a vegetarian restaurant in the Approved Location.

6.1.1 The Master Licensee shall take due care and diligence and take all steps including legal to protect the Licensor's interest with reference to the trademark, watermark, license mark, logo, emblem, etc. If expenses are incurred by the Sub-Licensee, then the same shall be deducted from the amount payable to Master Licensee.

6.2 The Master Licensee promises to, in consultation with the Licensor, assist in the supervision of the design, construction, and interior decoration of the Approved Location of the Sub-Licensee.

6.3 The Master Licensee promises to take suitable steps to ensure that the Sub-Licensee does not violate the spirit of this agreement.

B.R.

6.4 The Master Licensee promises to take suitable steps to ensure that the Sub-Licensee maintains proper books of accounts and records; and to collect the fees contemplated by this Agreement.

6.5 The Master Licensee will ensure that the general policy of the Licensor with respect to maintaining the quality of products, maintaining the quality of the customer service, and maintaining the goodwill of the Proprietary Marks is adhered to by the Sub-Licensee.

6.6 The Master Licensee promises to visit the Approved Location frequently to ensure that quality is maintained as per Section 6.6. and remains consistent with industry standards.

6.7 The Master Licensee agrees to create a suitable atmosphere for the Sub-Licensee and its employees to interact with Master Licensee and its employees.

6.8 The Master Licensee promises to share the process of preparation of any new items that are prepared and marketed by Licensor, and to update recipes used by the Sub-Licensee, as soon as updates are received from the Licensor.

## 7. LICENSEE COVENANTS.

7.1 By the spirit of this Agreement, the Sub-Licensee will be required to perform construction work or significant renovation at the Approved Location; and herby agrees to do so in consultation with the Master Licensee. Sub-Licensee will submit the designs, plans, drawings, specifications and front elevations to Master Licensee, for review by the Master Licensee. The Sub-Licensee will obtain all necessary approvals from the relevant authority prior to commencement of any work. The Sub-Licensee will ensure that the Approved Location is constructed to be on par with the brand's image and reputation.

7.2 Sub-Licensee, under no circumstance, will commence the business operation until all necessary licenses have been obtained from the authorities concerned.

7.3 The Sub-Licensee promises to display the Proprietary Marks prominently at the Approved Location to enhance the goodwill and brand image.

7.4 The Sub-Licensee agrees to take all suitable steps to run the Approved Location in an efficient manner and to keep the location clean and hygienic. The Sub-Licensee will make such routine maintenance, repairs, alterations, and replacements that are necessary to maintain the restaurant in the best possible manner.

7.5 The Sub-Licensee agrees to renovate the dining area, kitchen area, wash area, and public utility area every five (5) years or at such other early period that may be necessary.

7.6 The Sub-Licensee agrees to evaluate personnel's credentials prior to offering employment. Additionally, the Sub-Licensee will hire employees who maintain cleanliness and present themselves in a pleasing manner.

7.7 The Sub-Licensee will ensure that employees are compensated appropriately and as per rules of the state and the country. Additionally, Sub-Licensee agrees to train employees on a continuous basis to make them well trained cooks, supervisors, service and maintenance personnel, etc.

7.8 The Sub-Licensee will maintain adequate employment records.

7.9 The Sub-Licensee agrees to follow the brand standards regarding the quality of raw materials to be used.

7.10 The Sub-Licensee will ensure that there is proper quality control to check the quality of the raw materials and finished products on a regular basis, to avoid any customer complaints and improve customer satisfaction.

7.11 Sub-Licensee agrees to select the pricing of food and products sold, in consultation with Master Licensee.

7.12 The Sub-Licensee agrees not to, under any circumstances, sell products of any competitors.

7.13 The Sub-Licensee will follow all reasonable suggestions and directions given by the Master Licensee to maintain and preserve in the Approved Location, the goodwill and reputation of the brand and the Proprietary Marks.

7.14 The Sub-Licensee understands that the Master Licensee has obtained the rights from the Licensor to allot the use of the Proprietary Marks and Licensed Products; and agrees that it has no rights regarding the Proprietary Marks or Licensed Products except for those expressly granted herein. It is the Sub-Licensee's duty to notify and assist the Master Licensee to defend such Proprietary Marks with all the force in its command in the case of misuse of the same by any third parties or any claim on the ownership of the same.

7.15 The Sub-Licensee agrees:

7.15.1 Either during the term of this Agreement or after the completion of the tenure or termination of this Agreement, to not directly or indirectly attack the rights of the Master Licensee or its affiliates;

7.15.2 To not contest the validity of the rights of Master Licensee to the Sub-Licensee;

7.15.3 To not contest the ownership of the Licensor in the Intellectual Property and Proprietary Marks;

7.15.4 To not use the Proprietary Marks during the continuation of this Agreement elsewhere in any other business of similar or other nature, or after termination of this Agreement; and

7.15.5 To not carry on any business which is similar to the business which is carried on by Licensor or Sub-Licensee during the existence of this Agreement and for a period of three (3) years from the cessation of this Agreement.

7.16 The Sub-Licensee agrees to not alter the composition of the firm/company/LLC which was originally formed at the time of entering into this Agreement without the express written permission of Master Licensee (a copy of Sub-Licensee's Articles of Formation/Incorporation or similar, and its Bylaws, Operating Agreement or similar are incorporated herein in Appendix B). Sub-Licensee agrees not to sell or assign the stake or controlling interest owned by him to other persons without the prior written consent of the Master Licensee; and agrees to give the first right of refusal if a sale or assignment is contemplated.

B.R

7.17 The Sub-Licensee during the tenure of this agreement will not enter into any agreement to use in any manner the trademarks or proprietary marks without the prior written approval of the Master Licensee. The Master Licensee has the right to grant or refuse at his own discretion.

7.18 The Sub-Licensee will not during the tenure of this agreement or thereafter share the recipes specific to the Licensor and Master Licensee recipes which are at its disposal, with anyone.

7.19 The Sub-Licensee will not during the term or thereafter, without Master Licensee's prior approval, copy or duplicate, record and reproduce in whole or part, or otherwise make available to third parties any confidential information.

7.20 The Sub-Licensee will during the term of this agreement take all steps to (a) comply with all applicable data protection laws, and (b) refrain from any action or inaction that could cause the Master Licensee or its affiliates to breach any of the Data protection laws .

7.21 The Sub-Licensee at its own expense will maintain proper and accurate books of accounts, records in accordance with generally accepted accounting procedures and principles consistently applied. Master Licensee, or its duly authorized agents or representatives, will have the right to inspect said books and records at Sub-Licensee's premises during Sub-Licensee's regular business hours; provided that Master Licensee will give reasonable advance notice of its intention so to do.

7.22 If requested, the Sub-Licensee will provide access to surveillance cameras installed at the Approved Location, and the software used for billing purposes to the Master Licensee.

7.23 The Sub-Licensee will submit to the Master Licensee after completion of each fiscal year the profit and loss reports that contains the details of income and expenditure records for the fiscal year in contention. If any discrepancy is noticed in the report a defective cure notice will be served on the Sub-Licensee giving reasonable time to cure the discrepancy, defect or mistake. If such discrepancy, defect or mistake reoccurs consistently then that will be cause for termination of this Agreement.

7.24 The Sub-Licensee will indemnify, defend and hold harmless Master Licensee and its affiliates, their officers, directors, agents, successors and successors in interest from and against all losses, cost, liabilities, damages, claim and expenses of every kind and description to the fullest extent permitted under the applicable law, which arise out of (a.) the unauthorized use of Proprietary Marks, and (b.) violation of applicable law. The Sub-Licensee will inform the Master Licensee about any actions.

7.25 The Sub-Licensee will insure the restaurant buildings, the business, the plant and machinery, the vehicles, and third-party liabilities; and will purchase employee insurance, fidelity insurance and all other insurance that are standard in similar business. If claims arise out of the actions or activities that take place in the restaurant, the Sub-Licensee at his own cost, will defend himself as well as the Master Licensee by employing competent legal counsel.

7.26 The Sub-Licensee will maintain records of Certificate of Insurance which will list out insurance policy number, policy period, coverage details and its premium.

7.27 The Sub-Licensee will keep record of all notices received by the Sub-Licensee from all or any government department which are in connection with carrying on the business under this Agreement.

## 8. TERMINATION

B.R

8.1 This Agreement will be terminated immediately under the following circumstances even without giving notice to cure the defect:

8.1.1 Sub-Licensee becomes insolvent.

8.1.2 Sub-Licensee makes a general assignment for the benefit of creditors.

8.1.3 Proceedings for a compromise is initiated with the creditors or initiated by or against or consented to by the Sub-Licensee.

8.1.4 When Sub-Licensee voluntarily files petition under any Bankruptcy, insolvency or any similar law or consents to involuntary petition under any bankruptcy or insolvency or similar law filed against it or an order approving an involuntary petition in bankruptcy or insolvency or similar declaration filed against the Sub-Licensee remains un-vacated 90 days.

8.1.5 When a competent court having jurisdiction passes an order, judgement, degree on the application of the creditor, adjudicating Sub-Licensee as Bankrupt or insolvent or similar status or approving a petition seeking reorganization or appointing a receiver, trustee or liquidator of all or substantial part of the Sub-Licensee 's assets and such order, judgment, degree remains unstated for a period of 90 days.

8.1.6 An execution order is passed against the Sub-Licensee or against the restaurant or any material real or personal property comprising the restaurant in connection with the final judgment for the payment of money.

8.1.7 The Sub-Licensee or any principal officer or shareholder or agent of the Sub-Licensee contrary to the provisions of this agreement discloses or causes to disclose any confidential information provided to the Sub-Licensee or the Sub-Licensee failed to exercise reasonable care to prevent such disclose.

8.1.8 The Sub-Licensee or any principal officer or shareholder of the Sub-Licensee is or has been convicted of a felony or other similar crime or offence

8.1.9 The Sub-Licensee or any principal officer or shareholder of the Sub-Licensee conducts himself or act in such a way that will adversely affect the Proprietary Marks, Licensed Products, and other interest associated with it.

8.2 The Master Licensee will have the option to terminate this Agreement after giving 15 days' notice for cure of default and the Sub-Licensee fails to cure the default within the time stipulated in the notice.

8.2.1 When Sub-Licensee does not follow all and any of the conditions laid down in this agreement;

8.2.2 When Sub-Licensee consistently fails to maintain the quality of the brand and products sold;

8.2.3 Sub-Licensee fails to pay amounts due to the Master Licensee under the terms of this Agreement when it becomes due and payable; and

B.R

8.2.4 When Sub-Licensee fails to cure the default /defect with the time stipulated in the notice.

8.3 Post Termination; Sub-Licensee's Obligations.

8.3.1 The Sub-Licensee after expiration or termination of this agreement will cease to have any of the rights mentioned under this agreement and will not act directly or indirectly that he is a present or a former Sub-Licensee of the Master Licensee.

8.3.2 The Sub-Licensee will forthwith cease to use the Proprietary Marks and Licensed Products in any form including any such names or rights which are similar or confusing similar including misspellings and acronyms.

8.3.3 The Sub-Licensee will immediately surrender all the licenses that have been obtained using the license grants herein.

8.3.4 The Sub-Licensee will surrender to the Master Licensee all confidential information recipes that were shared by the Licensor or the Master Licensee, Proprietary Marks held in print form, etc.

8.3.5 The Sub-Licensee will take suitable steps to make alterations in the restaurant and front elevation, interiors so that they do not resemble in any way the former establishment.

8.3.6 The Sub-Licensee alone will be responsible for the amounts due to the supplier, creditors and others as a result of the operation of the restaurant which was carried on pursuant to this Agreement.

8.4 Post Termination; Master Licensee's Rights.

8.4.1 If the present Agreement is terminated because of the non-compliance of the terms and condition of this agreement then, the Master Licensee will be entitled to pursue legal and other remedies to claim compensation for the damages that the Master Licensee incurred or would have incurred. The damages will include but be not limited to: (a) loss of future Royalty Fees and (b) injury to the goodwill and Proprietary Marks, etc.

8.4.2 The Master Licensee will have the right to give notice of the termination of this Agreement and take suitable steps to ensure the Sub-Licensee makes payments relating to customers, suppliers and others will be affected by cancellation of this Agreement.

## 9. PROHIBITIONS OF ASSIGNMENTS AND TRANSFERS

9.1 Without the prior written consent of Master Licensee, Sub-Licensee will not voluntarily or by operation of law assign or transfer this Agreement or any of Sub-Licensee's rights, duties, or interests thereunder or sublicense the use of the Trademarks by others. A change in control of the Sub-Licensee or any assignment, transfer, or sublicense of any rights hereunder without the express prior written consent of Master Licensee will be grounds for immediate termination of this Agreement by Master Licensee at Master Licensee's option by written notice to Sub-Licensee specifying the effective date of termination.

9.2 In each instance in which Master Licensee's consent to an assignment, transfer, or sublicense is requested, Sub-Licensee will give prior written notice of at least thirty (30) days of the proposed

B.R

assignment, transfer, or sublicense. Sub-Licensee will be responsible for the payment of all transfer fees and expenses to the Master Licensee, whether or not the assignment, transfer, or sublicense is approved. Master Licensee's approval will not be unreasonably withheld.

9.3 The consent of Master Licensee to one assignment, transfer, or sublicense will not be deemed to be consent to any other assignment, transfer, or sublicense. Any assignment, transfer, or sublicense in violation of the provisions of this Section will be void.

## 10. NO POACH CLAUSE

10.1 No Poach Clause. Sub-Licensee promises that any employee working for another Sub-Licensee will not be asked/requested/forced/encouraged by /lured for better salary or benefits while that employee is working for any other Sub-Licensee in the United States for a period of twelve (12) months beginning on the date of that employee's resignation or termination.

10.2 The Master Licensee will take due care and diligence and take all steps to ensure that its Sub-Licensee strictly adhere to this No Poach Clause between its Sub-Licensees. This No Poach Clause is established for the protection of all Sub-Licensees.

10.3 To prevent poaching of employees, the Sub-Licensee may submit the name and details of any potential employees to the Master Licensee to verify that employee's ability to work freely without Sub-Licensee breaching this No Poach Clause. If such information is submitted, the Master Licensee agrees to keep the information confidential and to use it to cross verify the employee's previous work history and conduct with other Sub-Licensees.

10.4 Master Licensee will treat any "whistleblowing" with utmost importance, imperativeness and confidentiality; as whistleblowing could jeopardize the business operations of its Sub-Licensee.

## 11. GENERAL

11.1 General Covenant. The Sub-Licensee and the Master Licensee mutually agree that they will work together for their mutual benefit and interest.

11.2 Disputes. In case of any disputes between the parties hereto the matter will be sorted out via direct consultation and negotiation between the parties to this Agreement. However, should a mutually acceptable solution not be found, the parties may agree to use mediation or non-binding arbitration to and settle the matter. The cost of any such mediation or arbitration will be borne equally by both parties.

11.3 Notice. The Address for all notices and communications which will be in writing are:

MASTER LICENSEE:
Mr. Balamurugan K Raja
3313 Alydar Road, Downingtown
Pennsylvania - 19335, USA

SUB-LICENSEE:
Mr. Senthilkumar Rajasekaran
1104 Nelson Place, Piscataway
New Jersey - 08854, USA

11.4 Closure. In the event of termination of this Agreement and the business is closed, the stock, fixed assets, interior decorations, plant and machinery, electrical and mechanical equipment, furniture, billing software, etc. will be valued and will be shared as EIGHTY PERCENT (80%) for Sub-Licensee and TWENTY PERCENT (20%) for Master Licensee; after all accounts payable and all debts are satisfied.

B. R

11.5 Right of First Refusal. Should the Sub-Licensee, for whatever reason, decide to close its business, Sub-Licensee hereby agrees to offer the first right of refusal to Master Licensee to take over the business.

11.6 Travel. Licensor or its affiliates, if requested by the Sub-Licensee, will visit the Approved Location as per the request. The Sub-Licensee agrees to cover such representatives' reasonable travel expenses, including First Class airfare, five-star hotel accommodations, transport, and incidental expenses.

11.7 Force Majeure. Except for the payment of money, neither the Master Licensee nor the Sub-Licensee will be liable to the other for any loss caused by the failure to observe and perform the terms and condition of this Agreement where such failure is caused by any act beyond the reasonable control of the parties, such as earthquakes, fire, floods, strikes, lockouts, breakdown in machinery, or due to any act by the government or any authority thereon.

11.8 Construction. In this document, unless the context otherwise requires:

11.8.1 Words importing the singular includes the plural and vice versa, and any gender includes the other gender;

11.8.2 An obligation of two or more parties will bind them jointly and severally;

11.8.3 Where a word or phrase is defined, cognate words and phrase have corresponding definitions;

11.8.4 Reference to: (a) a person includes all types of corporation, political body, firm, organization, partnership, joint venture or other legal entity, (b) a person includes the legal personal representative, successors and assigns of that person; (c) a statute ordinate code or other law includes regulations and other statutory instruments under it and consolidations, amendments, re-enactments or replacements of any of them made by any legislative authority, (d) this or any other document includes the document as varied or replaced and notwithstanding any change in the identity of the parties, (e) writing includes any mode of representing or reproducing words in tangible and permanently visible form, and includes telex and facsimile transmission; and (f) a week means a period commencing Monday and ending on Sunday; and

11.8.5 Payment means all payments to be made under or pursuant to this Agreement will be payable in USD except where otherwise specifically provided.

IN WITNESS THE PARTIES TO THIS AGREEMENT HAVE SET THEIR HANDS ON THIS DAY MONTH AND YEAR ABOVE MENTIONED.

MASTER LICENSEE: Adyar Ananda Bhavan Sweets & Snacks, Inc.

Balamurugan K Raja, Vice President

SUB-LICENSEE: Blue Bell USA, LLC

Mr. Senthilkumar Rajasekaran, Authorized signatory

**Appendix A**

**Proprietary Marks**

A2B

VEG. RESTAURANT

## Appendix B

### Sub-Licensee's Entity Formation Records